NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0296n.06
Filed: April 18, 2005

Nos. 02-1738, 02-2214

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| SAMI MAKKI; ALVIN BOUDREAU, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants; | ) | **O P I N I O N** |
| | ) | |

BEFORE:    RYAN, COLE, and ROGERS, Circuit Judges

**R. GUY COLE, JR., Circuit Judge.** This case arises from an international heroin smuggling ring whose preferred methodology was to manufacture the heroin in Lebanon, and then place it in small plastic straws that would then be woven into Muslim prayer rugs and shipped via Canada to the United States where, due to their religious nature, the rugs would evade close customs scrutiny. Defendant Makki was a cousin and assistant of one of the principal organizers of the ring. He appeals his conviction on heroin distribution-related conspiracy charges on the grounds that he should have been granted a mistrial by the district court. Defendant Boudreau was a local heroin distributor in Dearborn, Michigan who appeals his conviction on ineffective assistance of counsel and other grounds, and also appeals a "career offender" sentencing enhancement. Because we find no prejudicial errors made below, we **AFFIRM** the judgments of the district court but **REMAND** Boudreau's case for resentencing in light of *United States v. Booker*, 543 U.S. ----, 125 S. Ct. 738 (2005).

**I.**

The Government alleged, and the jury agreed, that both Boudreau and Makki were part of an international heroin smuggling and distribution ring. In order to understand better both Appellants' evidentiary claims, a brief background as to the ring's activities is in order:

In 1992, Hassan Hamdar, apparently a Lebanese citizen, began manufacturing prayer rugs in Lebanon. These rugs would have woven-in plastic straws that would then be filled with heroin which was manufactured in Lebanon's Bekaa Valley. Hamdar would then arrange for the rugs to be shipped to Canada, where apparently, due to their religious nature, they would not be searched closely at customs. In Montreal, Ali Chami, Hamdar's agent in Canada and the United States, would then arrange for a courier to bring the rugs from Montreal to Windsor, Ontario. The rugs would then be taken across the border to Detroit. Once the rugs were in the U.S.A., the courier and/or Chami would cut them open and provide the heroin to local drug distributors.

One of Chami's couriers was Kassem Saad, who had been a neighbor of Chami's in Lebanon and had moved to Canada in 1992. Another such courier was Abdullah Chedid. Saad and Chedid helped transport the heroin from Canada to the United States, and would return the proceeds back to Chami. At least once, they testified, they delivered the heroin to Defendant-Appellant Sami Makki in Windsor.

Over the period from 1992 to 1997, Chami was living "on and off" at the house of his cousin, Defendant-Appellant Sami Makki, on Miller Road in Dearborn Michigan. Here, Chami and Saad

later testified, Chami, Chedid, and Saad would cut up incoming prayer rugs, remove the heroin, and store the heroin with Makki until it could be sold to local distributors. One such distributor was a man named "Blue"; Chami and Chadid testified that they delivered heroin to Blue at his house at 5133 Collingwood in Dearborn about once per week in early 1997. Later that year, Chami and Saad moved together into a house on Carlton Lane in Dearborn. On May 30, 1997, Officer James Kieffer of the Dearborn Police executed a search warrant on the Carlton Lane house, where a gun and a small amount of heroin were found. Following this search, Chami testified, Chami instructed Makki to give the remaining heroin at the Miller Road house to Chedid, who would then sell it before the police were able to find it. Later that same week, based on evidence discovered during the Carlton Lane search and on information from the DEA and at least two confidential informants, Officer Kieffer obtained and executed a search warrant for the Miller Road house in which Makki resided. Only documentary evidence of Makki's residence was found in the Miller Road house; no heroin was found there.

In December 1997, Officer Kieffer, acting on an independent tip from a prisoner in a separate investigation, obtained a search warrant for 5133 Collingwood Street in Dearborn, a house known to be inhabited by Blue. It is undisputed that Blue was Defendant-Appellant Alvin Boudreau. Upon execution of the search warrant, Officer Kieffer found paraphernalia associated with heroin distribution, along with half an ounce of extremely high purity heroin and fourteen firearms, some of which were automatic weapons. Following the seizure of these items, Boudreau was brought in for questioning, but was released pending investigation.

In May 1998, Saad decided to cooperate with law enforcement. During the course of Saad's debriefing, he and Officer Kieffer discussed and visited several of the locations where Saad said heroin from the prayer rugs had been delivered. One of these locations was 5133 Collingwood Street, Boudreau's house. Prior to this discussion, Officer Kieffer had no notice of any connection between the two cases. *Id.*

Over the course of the next year, Officer Kieffer, along with the DEA, and with the intermittent help of Saad (who at one point left the country, was arrested in the Netherlands, and returned to Detroit having waived extradition), continued to investigate the heroin ring. During the investigation, Kieffer obtained a search warrant for a location where prayer rugs containing heroin were found. The heroin in these rugs was of the same type and purity as that found at Boudreau's Collingwood residence. Another time, during a recorded conversation between Saad and Chami (who was by now living only in Lebanon), Chami mentioned making deliveries to Blue, among other customers. Finally, in 2000, Officer Kieffer and the DEA were able to arrange a drug purchase from Chami in Curacao where Chami was arrested in possession of a heroin-filled prayer rug. In all, the investigation of the prayer rug smuggling ring led to the indictment of 34 defendants and numerous arrests and prosecutions, including those of Chami, Chadid, and Saad, as well as Makki and Boudreau. Makki and Boudreau were both convicted by a jury of conspiracy to distribute heroin and conspiracy to manufacture with intent to import, distribute to import, and import heroin.

Both defendants timely appealed their convictions, and Boudreau additionally challenges the application of a "career offender" sentencing enhancement.

## II.

### A. Defendant-Appellant Makki

Makki challenges his conviction, arguing that the district court should have granted his motion for a mistrial in light of certain testimony by Officer Kieffer. We review district court decisions to deny a mistrial for abuse of discretion. *United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994). In *Forrest*, this Court outlined four factors for evaluating whether a mistrial was warranted: (1) whether the government's line of questioning was reasonable; (2) whether the limiting instruction was immediate, clear, and forceful; (3) whether any bad faith was evidenced by the government; and (4) whether the testimony at issue amounted to only a small portion of the government's case. *Forrest*, 17 F.3d at 920. With these factors in mind, we turn to the testimony challenged by Makki.

On cross-examination, Makki's attorney repeatedly questioned Officer Kieffer regarding the contents of reports he submitted to the DEA regarding his conversations with Saad. On redirect, the prosecutor referred Officer Kieffer to a paragraph of the report which said:

> Chami then had Saad take the prayer rug containing the heroin to Chami's cousin's residence located at 7338 Miller Road in Dearborn, Michigan. Saad stated Chami's cousin's name is Sam Makki, and that Makki would then take the money to his aunt's residence located at 7400 Oakman Boulevard in Dearborn, Michigan.

The prosecutor then asked "Did you understand that to mean what about 7338 Miller Road?" *Id*. In response, Kieffer said:

> When he told me that, knowing that I obtained a search warrant for 7338 Miller Road in – in May of – May 30th of 1997, where the other

> two informants basically corroborated the same thing, saying that
> 7338 Miller Road is a stash house.

*Id.*

At this point, Makki's attorney immediately objected and moved for a mistrial. Both parties agreed that the prosecutor had not intended, with his question, to elicit testimony regarding the confidential informants, nor had he intended to elicit Officer Kieffer's personal belief that Makki's house was a "stash house" for heroin. Makki's attorney protested that he did not know the identity of the informants, nor could he examine them in any way. The prosecutor then offered to produce the informants, but Makki's attorney never responded to this offer. The judge immediately determined that a curative instruction, rather than a mistrial, was warranted, and agreed to include in the instruction Makki's requested admonishment that the jury should only rely on evidence heard and seen in the courtroom. The judge then instructed the jury as follows:

> Ladies and gentlemen, the Court has heard an objection at side-bar,
> and I've sustained the objection presented by [Makki's attorney].
>
> You are to disregard the witness's reference to two confidential
> informants that was made in his last answer. Also, you are to
> disregard the witness's opinion that the residency served as a stash
> house for drugs.
>
> That conclusion, if – or any conclusion concerning the – the
> residence is one for you to make, not – not the proper subject of
> opinion testimony from this witness.
>
> And as a general matter, of course, you are to base your conclusions
> on the evidence that you hear and see in the courtroom. So, with that
> instruction, we'll continue the [examination].

Neither party disputes that the jury should not have heard the objected-to testimony. *See, e.g., Dutton v. Evans*, 400 U.S. 74, 88 (1970). But a brief review of this interchange in light of the *Forrest* factors shows that a mistrial was not warranted here. First, neither party disputes that the line of questioning was reasonable nor that the prosecutor was acting in good faith when he asked Officer Kieffer what he inferred about Makki's house from Saad's statement.[1] Further, the limiting instruction was quite clear, immediate, and forceful, speaking directly to the testimony that Makki challenges. Juries, of course, are presumed to understand and follow such instructions, in the absence of any evidence to the contrary, *United States v. Chambers*, 944 F.2d 1253 (6th Cir. 1991), *cert. denied*, 502 U.S. 1112 (1992), *superseded by statute on other grounds as recognized in United States v. Avery*, 128 F.3d 966, 972 (6th Cir. 1997), and unless the evidence is "so prejudicial that a jury could not be trusted to disregard it." *United States v. Ursery*, 109 F.3d 1129, 1133-34 (6th Cir. 1997). The evidence here is not highly prejudicial, especially in light of the fact that Makki's own prior cross-examination of Officer Kieffer had already established that Officer Kieffer was working with informants when he obtained a warrant to search Makki's house.

Finally, Saad, Chedid, and Chami all testified against Makki, stating that his house was used to store heroin, and that he had been knowingly involved in both transporting and processing the heroin. Their testimony was a much greater portion of the evidence against Makki than was the brief

---

[1]Note that the situation would be different had the prosecutor referred to these reports, which contained numerous instances of hearsay, on direct examination. However, Makki's own attorney raised the issue of the contents of the reports (and related conversations) in detail on cross-examination, and so could not dispute the propriety of the government's exploration of these same conversations on redirect.

statement by Officer Kieffer as to the informants and as to his opinion that Makki's residence was a stash house. The testimony of the three co-conspirators, in conjunction with the fact that Makki's own cross examination of Officer Kieffer had already revealed the existence of the confidential informants, provided ample additional evidence of guilt besides the challenged statement, and thus, under the *Forrest* factors, a mistrial was clearly not warranted.

Makki further argues that, given the lack of physical evidence in this case, the only evidence that corroborates the statements of the co-conspirators is the stricken testimony at issue. But this Court has held that the testimony of co-conspirators alone can be sufficient to prove the existence of a conspiracy. *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003). Makki had the opportunity to cross-examine the three co-conspirators, and the jury had the opportunity to evaluate their credibility. Accordingly, under *Forrest*, there was sufficient additional evidence of Makki's guilt such that a mistrial was not warranted here.

### B. Defendant-Appellant Boudreau

*1. Ineffective Assistance of Trial Counsel*

Defendant-Appellant Boudreau first claims that his conviction should be vacated on ineffective assistance of counsel ("IAC") grounds. Ordinarily, this Court does not address IAC claims on direct appeal, "since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Hamilton*, 263 F.3d 645, 655 (6th Cir. 2001); *see also United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999). However, on occasion, the record in the case is sufficient as to ineffective assistance alleged by the defendant.

*See, e.g., Fortson*, 194 F.3d at 736; *United States v. Kincaide*, 145 F.3d 771, 785-86 (6th Cir. 1998).

In order to determine if the record is sufficient, we examine if resolution of the IAC claims would

require "assessing allegations and evidence that are outside the record." *United States v. Pruitt*, 156

F.3d 638, 646 (6th Cir. 1998).

Here, Boudreau alleges that his attorney should have objected to the evidence gathered at

his home, because the affidavit used to secure the warrant under which the search proceeded was

insufficient. However, the details of the warrant and the application therefor are not clearly

contained within the record, nor do we have any details regarding Boudreau's attorney's decision

not to challenge the warrant and related evidence. Therefore, Boudreau's IAC claims would be "best

brought . . . in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop

an adequate record on the issue," as suggested by the vast majority of Sixth Circuit cases addressing

IAC on direct appeal where IAC was not raised before the district court. *United States v. Foster*, 376

F.3d 577 (6th Cir. 2004); *see also United States v. Daniel*, 956 F.2d 540, 543 (6th Cir. 1992). The

proper action in situations such as this is to dismiss the IAC claims from a defendant's direct appeal

without prejudice. *Id.*

*2. "Career Offender" Sentencing Enhancement*

Boudreau next claims the district court improperly applied to him the "career offender"

sentencing enhancement under U.S.S.G. § 4B1.1, on the grounds that a prior conviction of his, used

by the district court in determining he was a "career offender," was actually related to the conspiracy

convictions currently at issue and thus could not be used for a "career offender" determination. We

review a district court's finding that prior sentences are "related" for the purposes of "career offender" determinations under a "clear error" standard, *see, e.g., United States v. Horn*, 355 F.3d 610, 612-15 (6th Cir. 2004) (citing *United States v. Lang*, 333 F.3d 678, 682 (6th Cir. 2003), and *Buford v. United States*, 532 U.S. 59 (2001)), noting however that the government bears the burden of establishing the applicability of a criminal-history-based sentence enhancement by a preponderance of the evidence. *United States v. Brown*, 147 F.3d 477, 485 (6th Cir. 1998).

In order to qualify as a career offender under § 4B1.1 during sentencing for a controlled substance violation, a defendant who was over the age of eighteen at the time he committed the instant offense must have "at least two prior felony convictions of . . . a controlled substance offense." U.S.S.G. § 4B1.1(a)(3). Under U.S.S.G. § 4B1.2(c), a conviction is considered a "prior" conviction if the defendant (1) "committed the instant offense of conviction subsequent to sustaining at least two felony convictions . . . and (2) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c). The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of <u>nolo contendere.</u>" This Court, along with other circuits, has interpreted § 4B1.2(c)(1) to mean that the conduct for which the defendant is currently being sentenced must have occurred, at least in part, after he sustained convictions on the prior offenses. *See, e.g., United States v. Wood*, 209 F.3d 847, 849 n.1 (6th Cir. 2000); *United States v. Carter*, 300 F.3d 415, 427 (4th Cir. 2002).

Boudreau does not challenge the first of the two "prior" convictions the Government held against him, a drug conviction from 1988. He does however, challenge the use of the second conviction, which was a Michigan state court conviction of "Controlled Substance Delivery / Manufacture of Narcotics Under 25 Grams," which he incurred in 1999 on an arrest that took place in October 1998. The indictment and judgment form in the instant case indicated that the approximate dates of the prayer-rug conspiracy were "1990 to July 2000." The Government insisted, in order to prove that Boudreau's 1999 offense was not "relevant" to the prayer-rug conspiracy conviction, that Mr. Boudreau's arrest after the raid on his house "ended his relevant conduct in this conspiracy." Boudreau claimed that since he was convicted of a conspiracy that continued until 2000, the 1999 state conviction for delivery and manufacture of narcotics was "related to" the conspiracy. In response, the Government argues that the fact that Boudreau was convicted of a drug offense during the time the conspiracy was underway does not necessarily mean the offense was related to the conspiracy.

It is undisputed that a defendant-conspirator can remain liable for the acts of his co-conspirators through the end of the agreed-upon conspiracy, even if the defendant has ceased affirmative acts in furtherance of the conspiracy. *United States v. Lash*, 937 F.2d 1077 (6th Cir. 1991). In fact, a defendant-conspirator's liability for acts of the conspiracy is generally presumed to continue for all acts of the conspiracy through its end, absent any affirmative act of withdrawal. *See, e.g., id.*; *Hyde v. United States*, 225 U.S. 347 (1912). This can be the case even if the defendant is arrested or imprisoned. *See, e.g., United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976). As

a result, the district court found Boudreau liable for acts of the conspiracy through 2000, even though it found he took no acts to further the conspiracy after his arrest during the 1997 search of his house.[2]

Given that the district court found that he was liable for the acts of the conspiracy through 2000, Boudreau argues that the burden was on the government to prove that his 1999 conviction was not related to his ongoing conspiracy liability in 1999. The pre-sentence investigation report ("PSR") alleged that the two offenses were not related, on the grounds that Boudreau ceased all conspiracy-furthering activity after his 1997 arrest, and the district judge found, as a matter of fact, that this was the case. Boudreau claims that this alone does not prove, by a preponderance of the evidence, that his 1999 conviction was unrelated to the instant conspiracy offense. He argues that the Government has thus not met the required burden for imposing a sentencing enhancement. But Boudreau has not satisfied his burden of production on this issue. As this Court has noted:

> [A] defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

---

[2]It should be noted that Boudreau has maintained his claim throughout the proceedings that he never met, knew, or dealt with the prayer rug conspirators. Unfortunately this has left him in the awkward situation of being unable to prove withdrawal; since he insists he was never in the conspiracy, or, indeed, even knew of the other men's existence, he can hardly claim he acted to notify them of his withdrawal.

*United States v. Lang*, 333 F.3d 678, 681-82 (6th Cir. 2003) (citations omitted). Here, not only did Boudreau not present any evidence that the PSR was incorrect, but he has also continuously denied all participation altogether in the prayer-rug conspiracy. He has not denied his guilt on the 1999 conviction, nor has he even hinted that he intended to sell the 1999 narcotics to customers of the conspiracy or that he purchased these narcotics from members of the conspiracy, nor suggested in any other way that the narcotics might be related to his conspiracy conviction. Thus, even on his version of the facts, the 1999 conviction was not related to the current conspiracy. As a result, and regardless of whether the district court was correct in finding that Boudreau ceased acting affirmatively in favor of the conspiracy following his 1997 arrest, the district court did not commit clear error in finding that Boudreau's 1999 conviction was unrelated to the conspiracy at issue here.

3. *Additional Pro Se Claims*

Finally, Boudreau filed several pro se supplemental briefs containing numerous additional challenges to his sentence. He first challenges the sufficiency of the evidence against him, but we have previously held that the testimony of co-conspirators, without more, can be sufficient to support a conspiracy conviction, *see, e.g., United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003), and that a large volume of narcotics purchased by a defendant can create a presumption of conspiracy to distribute. *See, e.g., United States v. Vincent*, 20 F.3d 229, 233 (6th Cir. 1994); *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003). In addition, though Boudreau challenges in some detail the factual assertions in the co-conspirators' testimony, the witnesses' credibility was a matter

for the jury, not for this Court. *See, e.g., Lones v. Detroit, Toledo, and Ironton R.R. Co.*, 398 F.2d 914, 921 (6th Cir. 1968).

Boudreau next challenges the power of Congress to enact the Controlled Substances Act, but we have previously denied such challenges. *See United States v. Tucker*, 90 F.3d 1135, 1140-41 (6th Cir. 1996); *United States v. Brown*, 276 F.3d 211, 214-15 (6th Cir. 2002). He challenges the sufficiency of his indictment, but the indictment, which alleges that he was involved in conspiracy to import drugs from abroad, is also sufficient, both constitutionally and factually. *See, e.g., United States v. Piccolo*, 723 F.2d 1234, 1237-39 (6th Cir. 1983) (*en banc*).

Boudreau also claims that the use of guns seized from his house constituted a "variance" or "amendment" to his indictment, and that these guns were highly prejudicial to his case, but we have previously held that firearms may be used as "tools of the trade" evidence in drug trafficking prosecutions. *See, e.g., United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001). These guns thus not only did not constitute a variance to or amendment of his indictment, but were also properly admitted to prove the charges against him. Boudreau additionally claims that prosecutorial misconduct during discovery kept him from properly preparing for trial, but has failed to show how such misconduct, even if proven, in any way prejudiced his case. In the absence of any such proof, any such misconduct constitutes harmless error. *See, e.g., Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

*4. Sixth Amendment Violations at Sentencing*

Finally, Boudreau argues in a supplemental pro se brief that his sentence violated his Sixth Amendment rights, under *Blakely v. Washington*, 542 U.S. ----, 124 S. Ct. 2531 (2004). Following briefing, the Supreme Court decided *United States v. Booker*, 543 U.S. ----, 125 S. Ct. 738 (2005), holding that the Sixth Amendment requires facts necessary for sentencing to be found by a jury, and rendering the federal Sentencing Guidelines advisory. Neither *Blakely* nor *Booker* having been decided at the time of Boudreau's sentencing, he did not raise any Sixth Amendment claims before the sentencing court. Accordingly, as with all constitutional claims raised for the first time on appeal, we review Boudreau's sentence for plain error. *See, e.g.*, *Johnson v. United States*, 520 U.S. 461, 466 (1997). In a supplemental brief submitted by counsel following *Booker*, Boudreau also argues that the very fact that he was sentenced under a mandatory sentencing system itself warrants resentencing, and notes that the sentence imposed upon him was at the lowest end of the Guideline range calculated by the sentencing judge. Given the lack of clear and specific evidence that the district court would not have imposed a lower sentence had the Guidelines been applied in an advisory fashion, we must vacate Boudreau's sentence and remand for sentencing. *See United States v. Barnett*, 398 F.3d 516, 523-31 (6th Cir. 2005).

## III.

For the foregoing reasons, the convictions of the defendants are **AFFIRMED**, but without prejudice as to Boudreau's claims of ineffective assistance of trial counsel. In addition, we **VACATE** defendant Boudreau's sentence and **REMAND** for resentencing in light of *Booker*.

RYAN, Circuit Judge, concurring in part.     I am pleased to concur in all of my brother's opinion, save Part II.B.2 which discusses and resolves Boudreau's "career offender" sentencing enhancement claim.  U.S.S.G. § 4B1.1.  That portion of the court's otherwise excellent opinion is, in my view, an unnecessary and undesirable, indeed inappropriate, advisory opinion.

I do agree that defendant Boudreau's sentence must be vacated because, as explained in Part II.B.4 of the court's opinion, the rule announced in United States v. Barnett, 398 F.3d 516 (6th Cir. 2005), requires it.