NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0143n.06
Filed: February 21, 2007

No. 05-6762

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| GARY DAVENPORT, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: GILMAN and GRIFFIN, Circuit Judges; and GWIN, District Judge.[*]

GRIFFIN, Circuit Judge.

Defendant-appellant Gary Davenport pled guilty to three offenses: possession of five grams or more of Schedule II controlled substance methamphetamine ("meth"), in violation of 21 U.S.C. § 841(a)(1); attempted manufacture of a detectable amount of meth, in violation of 21 U.S.C. § 846; and failure to appear for trial while on bond, in violation of 18 U.S.C. § 3146. The plea agreement recommended holding Davenport responsible for only 6.9 grams of meth and calculated the offense level as 25; accordingly, the agreement contemplated a sentence within the corresponding suggested Guidelines range of 70-87 months imprisonment. By contrast, the probation office's presentence

_____

[*]The Honorable James S. Gwin, United States District Judge, United States District Court for the Northern District of Ohio, sitting by designation.

report ("PSR") recommended holding Davenport responsible for 1,365.1 grams of meth and for the possession of a firearm during a drug offense, and calculated the offense level as 37. Accordingly, the PSR urged a sentence within the corresponding suggested Guidelines range of 262-327 months' imprisonment. Both Davenport and the prosecution filed objections to the PSR, but the probation office rejected the objections.

Davenport does not dispute the government's statement that, at the plea colloquy, the district court advised Davenport, and he acknowledged, that the agreement did not bind the court, that the court had concerns about the agreement's Guidelines calculations, and that the court could impose a sentence much higher than that recommended by the agreement.

After a hearing, the district court adopted the PSR's determination of the meth weight attributable to Davenport and its finding that he possessed a handgun during a drug offense. The district court sentenced Davenport to concurrent sentences of 130 months each on the two meth convictions, and a consecutive 30 months on the failure to appear for trial, for a total of 160 months.

Upon timely appeal, Davenport asserts two assignments of sentencing error. First, Davenport contends that the district court erred in attributing 1,365.1 grams of meth to him because there was insufficient evidence to establish that he participated in the theft or concealment of that quantity of meth. Second, Davenport contends that the district court erred in adding two offense levels under U.S.S.G. § 2D1.1(b)(1) because the evidence did not support a finding that he possessed a firearm during the meth offenses. Following our review of the record, and applying our standard of review, we hold that the district court did not commit clear error in its determination of drug quantity.

Because we also conclude that the district court did not clearly err in finding that Davenport possessed a firearm during the commission of the meth offenses, we affirm defendant's sentence.

I.

The district court had jurisdiction under 18 U.S.C. § 3231, which provides that "[t]he district courts of the United States shall have original jurisdiction . . . of all [actions charging] offenses against the laws of the United States." We have jurisdiction under 28 U.S.C. § 1291.

II.

A district court's calculation of the amount of drugs for which a defendant is accountable is reviewed only for clear error. *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004), *cert. denied*, 543 U.S. 1129 (2005). Its finding that a defendant possessed a firearm during a drug offense is likewise reviewed only for clear error. *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005) (citing *United States v. Solorio*, 337 F.3d 580 (6th Cir. 2003)).

III.

Davenport dialed 9-1-1 and told the police that his "friends had stolen ten pounds of methamphetamine" and that the meth was in a camper where his friends were staying, along with two guns. The police searched the camper, where codefendant Roxanne Abner and codefendant Wilson were present, and found 1,179 grams of 37%-pure meth,[1] i.e., the equivalent of 463.2 grams

---

[1]This court has recognized the practice of "cutting" illegal drugs: "'Inactive ingredients are combined with pure [forms of the illegal drug], and the mixture is then sold to consumers as a heavily diluted form of the drug.' By diluting the drug with some other substance, the distributor is increasing the amount of the drug he has available to sell to consumers . . . ." *United States v. Jennings*, 945 F.2d 129, 137 (6th Cir. 1991) (quoting *Chapman v. United States*, 500 U.S. 453, 460

- 3 -

of actual 100% meth, in a nylon bag.  The police also found 19.6 grams of 36-37%-pure meth, i.e. the equivalent of 7 grams of actual 100% meth, in a shaving kit.  The police search of the camper also uncovered a shotgun, which Wilson said belonged to Davenport.  Davenport denied owning the shotgun but acknowledged knowing about a handgun in Wilson's truck.  Wilson led the police to another six pounds of meth; to be precise, 2,561 grams of 36%-pure meth, the equivalent of 921.9 grams of actual 100% meth.

Drug Task Force Officer Harris testified that, when he responded to the 911 call, Davenport told him that "the Mexican Mafia was in the area, he feared for his life . . . and there was a large quantity of methamphetamine . . . and some firearms" in his friend's camper.  According to Officer Harris, the police found a handgun in a parked truck and a shotgun in a camper, which Wilson said belonged to Davenport; Officer Harris also recalled that Davenport appeared to be afraid.

After Davenport's arrest, he admitted that he had traveled with Wilson in a trailer to steal meth out of a parked truck, and that Wilson had stolen the meth from the truck while he (Davenport) waited in Wilson's truck.  (At a later change-of-plea hearing, Wilson testified that *he* had remained in the vehicle while *Davenport* got out and stole the meth.)

At sentencing, codefendant Abner testified that she had seen Davenport in possession "the whole time" of the handgun found in codefendant Wilson's truck.  Abner had seen the handgun in Davenport's pants shortly before his arrest, and she said that Davenport had been "so nervous" that

---

(1991)), *clarified on other grounds*, 966 F.2d 184 (6th Cir. 1992).

she had been "worried that he was going to shoot someone." Abner further testified that Davenport and Wilson told her that the two of them had stolen the meth.

Also at sentencing, codefendant Wilson testified that Abner told him where the meth was, whereupon he and Davenport "went and stole it." Consistent with Davenport's admission to the police, Wilson testified that he had removed the meth from the truck while Davenport waited nearby in Wilson's truck. According to Wilson, Davenport "had the pistol."

The district court also heard from United States Drug Enforcement Administration ("DEA") Special Agent David Gray, who was present when Davenport and his codefendants were interviewed after their arrest. Agent Gray testified that Wilson said that he (Wilson) and Davenport stole the meth, specifically, that Wilson "actually broke into the truck as he [Davenport] stayed in the – their truck."

Based on this testimony and the information in the PSR, the district court reasoned that the purity of the meth – about 37% pure for each batch of meth found at the campground – indicated that all the meth came from the same source.

The district court further found that the guns recovered by the police were connected to the meth offense and were present for defendants' protection. Relying on what it called the "credible" testimony of codefendant Abner that Davenport was so nervous that she was afraid he might shoot someone, the district court found that Davenport possessed the handgun during the meth offense.

IV.

At sentencing, it was the prosecution's burden to prove the amount of meth attributable to Davenport by a preponderance of the evidence. *United States v. Swanberg*, 370 F.3d 622, 624-25 (6th Cir. 2004) (citing *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)).

In determining whether the district court clearly erred in calculating the quantity of meth for which Davenport is accountable, "a key issue is the extent to which the [district] court identified the evidence on which it relied in making that calculation." *United States v. Henley*, 360 F.3d 509, 515 (6th Cir. 2004). Here, the district court stated that it credited the testimony of DEA Agent David Gray in finding that Davenport admitted (to Agents Johnson and Gray) that he was in the truck and helped Wilson steal the meth (about ten pounds);[2] thus, the district court explained, it found that Davenport was responsible for all of the pounds of meth recovered, rather than merely the 6.9 grams suggested by the parties in the plea agreement.

In addition, the district court's finding necessarily shows that it implicitly credited the testimony of codefendant Abner that Davenport helped Wilson steal the meth,[3] and the testimony

---

[2]Agent Gray's recollection of Davenport's alleged admission is not a separate piece of evidence from that admission.

[3]The dissent correctly notes that Abner gave conflicting testimony as to whether she knew who stole the meth. Although Abner stated that Davenport confessed his involvement in the theft to her, Abner also stated several times at the sentencing hearing that she did not have personal knowledge of who was involved in the theft.

But we cannot agree with the dissent's assertion that Abner's testimony must therefore be taken as tipping in Davenport's favor. Abner was necessarily lying either when she testified that Davenport told her he stole the meth or when she testified that she did not know who stole the meth. Based on its firsthand observation of Abner while she testified, the district court credited the former testimony by Abner, and there was nothing unreasonable about doing so.

of Wilson that Davenport helped him steal the meth.

By crediting those persons' testimony and admissions, the district court necessarily implicitly rejected Agent Johnson's arguably conflicting testimony. *Cf. United States v. Graham*, 317 F.3d 262, 271 (D.C. Cir. 2003) ("With respect to the contrary testimony regarding the availability of cocaine base in the District during the summer of 1999, the district court referred [to] Andrews' testimony in making its ruling, implicitly indicating that it was crediting Andrews' testimony."); *United States v. Huskey*, 137 F.3d 283, 291 (5th Cir. 1998) ("In attributing to Huskey the entire amount of the 1992-1995 Kansas City shipments [of marijuana], the district court credited Cornelius's, and implicitly Barnes's, testimony that . . . Barnes continued to take deliveries for Huskey.").[4]

It is of no avail to Davenport that the district court did not expressly state that it discounted Agent Johnson's testimony regarding Davenport's post-arrest statements about his connection to the meth. In this regard, we agree with the following reasoning of the Fifth Circuit:

> When . . . a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly.

*Self v. Collins*, 973 F.2d 1198, 1214 (5th Cir. 1992) (quoting *Lavernia v. Lynaugh*, 845 F.2d 493,

---

[4]*Cf. United States v. Welch*, 97 F.3d 142, 154 n.8 (6th Cir. 1996) ("[I]n crediting the version of events as described in the presentence report and as the District Court believed Wilson testified, it *implicitly made a credibility determination* with regard to Baldwin who testified consistently as to this version of the same events.") (emphasis added).

500 (5th Cir. 1988) (citing *Marshal v. Lonberger*, 459 U.S. 422, 433-34 (1983))).

On balance, it was not clear error for the district court to conclude that Wilson did not steal any of the meth without Davenport's assistance. On Davenport's side of the ledger, Agent Johnson's report did quote Davenport as stating that "Wilson had told [Davenport] that Shawn Noe and Mike Cain assisted him," i.e. Wilson, "in stealing the methamphetamines from Walters." However, so far as the record reflects, Davenport never told his codefendants that Wilson stole any of the meth without his assistance, and neither Abner nor Wilson claimed that Wilson stole any of the meth without Davenport's assistance. Nor does the rest of the record dictate the conclusion that any of the meth came from a source other than the truck that Davenport and Wilson admittedly robbed together.

On the contrary, the fact that the several amounts of meth were of the same purity constituted circumstantial evidence from which the district court could reasonably infer that all the meth came from the same source – again, the truck from which Davenport and Wilson admittedly stole the meth *together*. *See United States v. Makki*, 129 F. App'x 185, 188 (6th Cir. 2005) (affirming distribution conspiracy charges and noting that "[t]he heroin in these rugs was of the same type and purity as that found at Boudreau's Collingwood residence."); *United States v. Hinton*, No. 99-1193, 229 F.3d 1154, 2000 WL 1234348, at \*1 (6th Cir. Aug. 24, 2000) (noting that the jury was not persuaded by defendant's claim that he was not connected with crack cocaine found in car where, *inter alia*, "[c]hemical analysis of the crack recovered from the junkyard and from the car trunk revealed that

the two samples were of identical purity and composition and appeared 'to be the same'").[5]

Davenport complains that,

> [i]n crediting agent Gray's testimony, the District Court ignored the exactly opposite testimony of DEA task force officer Rick Johnson who after all was the agent who conducted the interview [of the defendants], took the notes and prepared the DEA report summarizing the interview. Not only did officer Johnson have no recollection that Davenport made any statement implicating himself in the theft of the methamphetamine, he further testified consistent with his report that he recalled Davenport stated [that] Wilson told him that Wilson, aided by Noe and Cain, stole the methamphetamine. [In contrast,] Agent Gray does not recall Davenport making this statement implicating Noe and Cain.

Davenport also complains that "[o]ddly, the District Court discounted Abner's testimony on this point [that she had no personal knowledge of who stole the meth] but credited her testimony that Davenport carried a pistol at the campground . . . ."

In lodging these criticisms, however, Davenport does nothing to question the competency, relevancy, or admissibility of the evidence tending to inculpate him, i.e., the testimony and out-of-court statements of codefendants Abner and Wilson, DEA Agent Gray, and Davenport himself.

Nor is Davenport actually arguing, as his brief imprecisely states, that the district court "ignored" Agent Johnson's testimony that Davenport implicated only Wilson, Noe, and Cain, rather than himself, in the theft of the meth. Rather, Davenport merely disagrees with the district court's

---

[5]*Accord United States v. Tapia-Torres*, Nos. 94-10134 & 94-10152, 52 F.3d 335, 1995 WL 218511, at *9 (9th Cir. Apr. 13, 1995) ("The methamphetamine in the June 17 half-pound delivery had the same purity level as that of methamphetamine seized from the Selma lab, which led to the inference that it had been manufactured there."); *United States v. Fierro*, 38 F.3d 761, 768-69 (5th Cir. 1994) ("The following evidence . . . supports the convictions of all defendants on all counts: * * * The bag, which had been seen previously in Martinez's possession, contained four kilograms of cocaine that was of similar purity to the cocaine seized from the stash house.").

discretionary decision to credit the testimony of Abner, Wilson, and Agent Gray, rather than Agent Johnson's contrary report and recollection.

On Davenport's behalf, we note that Agent Gray admitted that "I don't remember word-for-word everything [Davenport] said," and that Gray did not conduct the interview or take notes. In light of Agent Gray's candor on this score, the dissent finds it suspicious that Agent Gray nonetheless insisted that he was "100 percent certain that [Davenport] said to [me] that day, that he was there when the meth was stolen." The dissent contends that the credibility of Gray's recollection is further undermined because, as Johnson himself observed, Davenport's admission ordinarily "[w]ould be something that you guys in the DEA would try to include in your report." Here we note, like the dissent, that Johnson's recollection is consistent with his report, i.e., Johnson did not recall "Davenport ever acknowledging that he was present with Chris Wilson during the theft of the methamphetamine."

A district court, however, is "in the best position to judge credibility," *United States v. Dillard*, 438 F.3d 675, 681 (6th Cir.) (citation omitted), *cert. denied*, – U.S. –, 127 S. Ct. 291 (2006), and this court accords "great deference" to such credibility determinations. *Id*. (citation omitted).

This is because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). As the Supreme Court has stated,

> Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . . How can we say the judge is wrong? We never saw the witnesses . . . .

To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.

*Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (citation omitted).

This is not to say that our deference to a district court's credibility assessments is unlimited. In determining whether a credibility assessment was clearly erroneous, "we have . . . looked at whether testimony is inconsistent or otherwise contradicts the [non-testimonial] record." *Dillard*, 438 F.3d at 681 (citing *United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004)). In this case, the district court's decision to credit the other witnesses over Agent Johnson is not clearly erroneous because the other witnesses' testimony about Davenport's responsibility for the meth does not contradict the non-testimonial record. The district court was free to credit Agent Gray's recollection of Davenport's admission because that recollection was *not* contradicted by Agent Johnson's report. Agent Gray testified that Davenport admitted to stealing the meth, while Agent Johnson's report simply does not address that issue one way or the other. The absence of a notation of Davenport's confession in Johnson's report does not "contradict" Agent Gray's recollection of Davenport's confession.

Ultimately, Davenport offers no evidence beyond Agent Johnson's testimony to support his claim that it was not he, but Cain and Noe, who helped Wilson steal the meth. *Cf. Dillard*, 438 F.3d at 681 ("[T]he district court's adoption of the police version [that Holton voluntarily let them in the apartment] is not clearly erroneous because the officers' testimony does not contradict the record. Dillard offers no evidence beyond Holton's testimony to support his version of the search.").

- 11 -

It was not unreasonable for the district judge to conclude that, while Agent Gray didn't remember every word of Davenport's interview, he was telling the truth when he recalled hearing Davenport confess. Just as Agent Gray's recollection could have been less than perfect, Agent Johnson's report could have been less than perfect, as well – for example, the district court reasonably could suspect that Johnson's recollection was influenced by his knowledge of what his report claimed. Charitably, Agent Johnson might have honestly come to believe that his recollection was correct because it matched his interview report.

In summary, this record *allowed* the district court to credit Agent Johnson's testimony over that of the other witnesses, but it did not *compel* the court to do so. Likewise, the record *allowed* the district court to discredit Abner's testimony that she had no personal knowledge of who stole the meth, but it did not *compel* the court to do so. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Dillard*, 435 F.3d at 681 (quoting *Anderson*, 470 U.S. at 574). Davenport provides no basis for us to disturb the finding that he was responsible for all the meth, rather than the 6.9 grams suggested by the plea agreement.

V.

Enhancement analysis under U.S.S.G. § 2D1.1(b)(1) has two parts. First, it was the prosecution's burden to prove by a preponderance of the evidence that Davenport possessed a firearm during a drug offense, in this case one of the two charged meth offenses. *Davidson*, 409 F.3d at 312 (citation omitted). Possession can be actual or constructive. *Id.* To establish constructive possession, the prosecution must show that Davenport had "ownership, dominion, or control over

the firearm or dominion over the premises where the firearm [was] located." *Id.* (internal quotation marks and brackets omitted).

If the prosecution establishes by a preponderance of the evidence that Davenport actually or constructively possessed a firearm, the burden shifts to Davenport to demonstrate that "it was clearly improbable that the weapon was connected to the [meth] offense." *Id.*; *United States v. Johnson*, 344 F.3d 562, 565 (6th Cir. 2003) (citing U.S.S.G. § 2D1.1(b)(1), cmt. 3). "'Only if the defendant can make this showing does the enhancement not apply.'" *Davidson*, 409 F.3d at 312 (quoting *Solorio*, 337 F.3d at 599). This court has "emphasize[d] that the 'clearly improbable' standard is a difficult burden to meet . . . ." *Johnson*, 344 F.3d at 567; *see also United States v. Bolka*, 355 F.3d 909, 914 (6th Cir. 2004) ("The 'clearly improbable' standard is a higher quantum of proof than that of the 'preponderance of evidence' standard.").

Adequate evidence led the district court to its finding that Davenport possessed the firearm during the meth offenses. First, Drug Task Force Officer William Harris testified that when he responded to the 911 call, Davenport told him that "the Mexican Mafia was in the area, he feared for his life, . . . and there was a large quantity of methamphetamine . . . and some firearms" in his friend's camper. Davenport himself states, "The evidence was uncontroverted that Davenport was very fearful for his life while at the campground." Absent evidence to the contrary, it is generally logical to believe that someone who fears for his life might possess a firearm to protect himself

against the source of the fear – in this case, meth dealers allegedly affiliated with Mexican organized crime.[6]

More specifically, Officer Harris testified that the police found a handgun in a parked truck and a shotgun in a camper, which Wilson said belonged to Davenport; Harris also recalled that Davenport appeared to be afraid. Most directly, codefendant Abner testified that she saw Davenport in possession "the whole time" of the handgun found in Wilson's truck. Abner testified that she had seen the handgun in Davenport's pants shortly before his arrest, and she said that Davenport had been "so nervous" that she had been "worried that he was going to shoot someone."

As with the drug quantity issue, Davenport rests his criticism of the district court's firearm possession finding on inconsistencies in the witnesses' testimony. For example, Davenport

---

[6]Independent of Davenport's fear of the people from whom the meth was stolen, this court has recognized that possession of illegal drugs itself can provide an incentive to possess a firearm – both because a large quantity of illegal drugs can be extremely valuable, and because trafficking in illegal drugs often invites and is characterized by violence. As this court stated in *United States v. Ricks*, No. 96-6544, 165 F.3d 29, 1998 WL 639166, at *3-4 (6th Cir. Sept. 10, 1998):

> [T]he district court concluded that Petitioner had failed to show that it was "clearly improbable" that the two shotguns were connected to the drug-trafficking offense. Specifically, the court found that the shotguns were located in close proximity to the cocaine and were readily accessible . . . . Thus, the court concluded, the evidence "supports th[e] finding that the shotguns were on the premises for the purpose of protecting the cocaine, the cash proceeds from the sale of cocaine, and to protect Ricks personally during the course of his cocaine transactions." * * * We conclude that the district court properly applied the § 2D1.1(b)(1) enhancement.

*See also generally United States v. Sagaste-Cruz*, 187 F. App'x 804, 809 (10th Cir. 2006) ("[I]t is quite common for drug dealers to carry weapons to protect their merchandise, their cash receipts, and to intimidate potential purchasers.") (citing *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000)).

complains that Wilson (1) told Officer Harris that Davenport possessed the shotgun, but made no mention of the handgun at that time, but then (2) testified at sentencing that Davenport possessed the handgun and he (Wilson) possessed the shotgun. "On cross-examination Wilson was not able to explain the difference in his two statements." This amounts merely to an attack on the district court's decision to credit Wilson's testimony, rather than his earlier statement to Officer Harris, and Davenport does nothing to convince us that that decision was clear error.

Davenport also complains that his codefendants' testimony that he possessed the handgun was "largely self-serving." This, too, boils down to an attack on the district court's decision to credit the codefendants' testimony that Davenport possessed the handgun. The district court was free to conclude that the codefendants' claim about who possessed the handgun was not credible because it was self-serving, i.e., designed to forestall the conclusion that it was one of the codefendants who possessed that weapon instead. But the district court was not compelled to do so. "There is no per se rule against 'self-serving' testimony." *Comeau v. Rupp*, 810 F. Supp. 1127, 1144 n.8 (D. Kan. 1992).

Davenport also reasons, "when officer Harris and the other police officers arrived Davenport had no weapon in his [actual] possession. One would think if Davenport had access to a weapon he would have had it with him at that time for his own protection." This argument is unavailing. The district court *could* have adopted that line of reasoning, but nothing in the record or the law *compelled* it to do so. The district court could reasonably find that Davenport constructively

possessed the handgun during the meth offense even if it believed that Davenport did not have the handgun on his person when the police arrived at the campground.

Thus, the district court did not clearly err in finding that Davenport possessed the handgun during the meth offenses. The burden then shifted to Davenport to show that it was "clearly improbable" that the firearm was related to the meth offenses. *Davidson*, 409 F.3d at 312. Davenport's appellate brief does not attempt to make this showing, and the record does not suggest that it was clearly improbable that the handgun was related to the meth offenses. *Cf. Davidson*, 409 F.3d at 313 ("Given the large presence of large quantities of drugs . . . , we cannot conclude that it was error for the district court to conclude that it was not 'clearly improbable' that the gun was connected to Mrs. Davidson's drug possession offense."). Therefore, the district court did not clearly err in finding that Davenport possessed a firearm during the meth offenses.

Affirmed.

**RONALD LEE GILMAN, Circuit Judge, dissenting in part and concurring in part.** The majority finds no clear error regarding either of the two district court rulings challenged by Davenport on appeal. Because I disagree with the majority's analysis and resolution of the first issue (drug quantity), but not of the second (firearm possession), I dissent in part and concur in part.

Gary Davenport pled guilty to three offenses: (1) possession of five grams or more of methamphetamine, (2) attempted manufacture of a detectable amount of methamphetamine, and (3) failure to appear for trial while out on bond. Regarding his sentence, Davenport's plea agreement recommended holding him responsible for 6.9 grams of methamphetamine, which translated into an offense level of 25 and a recommended Sentencing Guidelines range of 70 to 87 months in prison. The Presentence Report (PSR), on the other hand, recommended holding Davenport responsible for 1,365.1 grams of methamphetamine, or approximately *200 times* the amount to which he stipulated in his plea agreement. This higher amount, together with other factors, translated into an offense level of 37 and a recommended Guidelines range of 262 to 327 months in prison. A downward departure reduced the range to 151 to 188 months in prison. After explaining that the sentencing recommendations in the plea agreement lacked binding effect, the district court adopted the exponentially higher drug-quantity recommendation of the PSR and sentenced Davenport to two concurrent sentences of 130 months' imprisonment, as well as an additional 30 months to run consecutively for his failure to appear at trial while out on bond, for a total of 160 months in prison.

On appeal, Davenport argues that the district court committed clear error by (1) attributing 1,365.1 grams of methamphetamine to him, despite allegedly insufficient evidence to establish that

- 17 -

he participated in the theft or concealment of that quantity of the drug, and (2) adding two offense levels under U.S.S.G. § 2D1.1(b)(1), despite allegedly insufficient evidence to support a finding that Davenport possessed a firearm during the relevant offense conduct. I set forth below the reasons why I believe that the first of these two rulings warrants vacatur.

## I. ANALYSIS

Even if, as the majority opinion emphasizes, witness-credibility assessments by district courts are very rarely found to be clearly erroneous, they are subject to question in a close case where the court totally fails to explain its reasons for favoring one witness over another, objectively more reliable witness. *Cf. Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("[F]actors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."). Both parties and the majority agree that the district court's findings regarding the amount of methamphetamine attributable to Davenport must be supported by a preponderance of the evidence. The majority opinion then lists the evidence that supported the district court's decision to attribute the entire amount of methamphetamine to Davenport, and concludes that this evidence in fact constituted a preponderance of all of the evidence in the case.

The common definition of the phrase "preponderance of the evidence," as found in law treatises and standard jury instructions, is evidence that is of greater weight, on balance, than that offered in opposition to it. *See, e.g.*, 32A C.J.S. *Evidence* § 1312 (2006). Despite lacking the district

court's advantage of personally observing the witnesses, I believe that the evidence supporting Davenport's position outweighs the evidence supporting the district court's attribution of the entire quantity of seized methamphetamine to him. Davenport's position was also the government's position at all times prior to this appeal. Although I am not quite prepared to conclude that the district court committed clear error in making this attribution, I do believe that the court clearly erred in failing to articulate *why* it reached the dispositive credibility determination that it did. I would accordingly vacate, rather than outright reverse, the district court's ruling on this issue.

## A. The evidence that supports Davenport

My review of the briefs and the record reveals that the following pieces of evidence support Davenport's position that he should have been held accountable for only 6.9 grams of methamphetamine, as stipulated in his plea agreement:

(1)  the plea agreement itself;
(2)  the government's objections to the PSR;
(3)  the post-interview report compiled by DEA Agent Rick Johnson; and,
(4)  the testimony of Agent Johnson.

### 1 & 2. Davenport's plea agreement and the government's objection to the PSR

As previously noted, the plea agreement recommended holding Davenport responsible for only 6.9 grams of methamphetamine, in stark contrast to the 1,365.1 grams attributed to him by the PSR. The government not only was a party to the plea agreement, but forcefully objected to the PSR in a letter submitted to the probation officer:

> Specifically, the United States objects to the increased drug amount for this defendant. The United States adopts the comments made at the time of the entry of the guilty plea as to this defendant. In summary, the statements of all three

defendants regarding Davenport's conduct are inconsistent to say the least. Although all three defendants are consistent as to the source of the methamphetamine, there are inconsistent statements as to whether this defendant actually broke into the truck with Wilson. No witness has stated that Davenport knew how much methamphetamine was stolen from the truck over and above what was located at the camper trailer. There is no proof that the defendant participated in hiding the stolen methamphetamine. As stated in the guilty plea, the United States does not believe that the drug amount over and above the Plea Agreement could be proven at trial. Furthermore, as the United States agreed to a certain drug amount in the Plea Agreement any amount over and above that is objected to by the United States.

### 3 & 4. *Agent Johnson's report and testimony*

DEA Agents Rick Johnson and David Gray interviewed Davenport immediately following his arrest. Agent Johnson conducted the interview, took notes, and alone compiled the post-interview DEA report. (Although Agent Johnson's report is not in the record, it is repeatedly referred to by the parties and the court, without objection, during the several hearings transcribed in the Joint Appendix.) Johnson's report quoted Davenport as stating, among other things, that "Wilson had told [Davenport that] Shawn Noe and Mike Cain assisted him, and him there would be Wilson, in stealing the methamphetamines from Walters." Nowhere in the report is there an admission by Davenport that he himself was involved in the theft.

Agent Johnson also testified at the sentencing hearing. Contrary to Agent Gray's testimony, discussed below, Johnson could not recall "Mr. Davenport ever acknowledging that he was present with Chris Wilson during the theft of the methamphetamine." The remainder of Johnson's testimony confirmed that his recollection of Davenport's interview was consistent in all relevant respects with the report that Johnson compiled immediately after the interview was complete.

**B.     The evidence that supports the district court's finding**

The majority opinion lists the following four pieces of testimonial evidence "tending to inculpate" Davenport and to support the district court's finding:

(1)     Davenport's purported post-arrest admission that he was in the truck and helped Wilson steal the methamphetamine;
(2)     the testimony of DEA Agent David Gray;
(3)     the testimony of codefendant Abner; and,
(4)     the testimony of codefendant Wilson.

I set forth below my doubts as to the weight to be given each of these pieces of evidence.

### 1.     *Davenport's purported post-arrest admission*

Regarding "the testimony of . . . Davenport himself" "tending to inculpate him" (Maj. Op. at 9), I assume as an initial matter that the majority is referring to paragraph 25 of the PSR, which reads as follows:

> On November 4, 2004, Davenport was arrested by DEA agents in Madison County. Once in DEA custody, Davenport consented to being interviewed. According to Davenport, he and Wilson traveled together to the trailer of Bill Walters' girlfriend, where Walters' truck was parked. Davenport reported that he remained in the vehicle while Wilson stole the methamphetamine from Walters' truck.

But in listing this alleged "admission" as a separate piece of evidence supporting the district court's finding, the majority opinion misconstrues the record and improperly engages in double counting. This so-called admission by Davenport was *Agent Gray's testimony*, not a separate and independent statement by Davenport himself. Agent Johnson's post-interview report, discussed above, contained no such admission by Davenport; the purported admission was instead purely Agent Gray's recollection. In other words, items (1) and (2) listed above—Davenport's "admission" and Agent

- 21 -

Gray's testimony—are one and the same single piece of evidence, not two separate pieces of evidence corroborating the same alleged fact.

The majority responds to this criticism by noting that "Agent Gray's recollection of Davenport's alleged admission is not a separate piece of evidence from that admission." (Maj. Op. at 6 n.2) With all due respect, the true situation is exactly the opposite. Under the majority's version, Davenport's admission is an established fact that Agent Gray's testimony simply corroborates. But the record makes clear that Davenport's purported admission comes *only* through Agent Gray's testimony. It does not otherwise exist.

### 2. *Agent Gray's testimony*

Agent Gray recalled Davenport saying during his post-arrest interview that "himself and Mr. Wilson had stolen the methamphetamine," but not, as Agent Johnson noted in the written report compiled immediately after the interview, that "Wilson told [Davenport that] Shawn Noe and Mike Cain assisted him in stealing the methamphetamine." Curiously, although Gray admitted that "I don't remember word-for-word everything [Davenport] said," Gray claimed to be "100 percent certain that [Davenport] said to [me] that day, that he was there when the meth was stolen." Making his selective memory even more suspect, Gray further conceded that this highly inculpatory statement that he recalled Davenport making "[w]ould . . . be something that you guys in the DEA would try to include in your report." But it was Davenport's statement implicating Noe and Cain, not any alleged confession by Davenport, that Agent Johnson recorded in his post-interview report.

The testimony of Agent Gray is questionable for several additional reasons. To be sure, Agent Gray, along with Agent Johnson, was present during the post-arrest interview of Davenport. As Davenport notes in his brief and as neither the government nor the majority disputes, however, Agent Gray was mostly an observer. He did not conduct the interview, take any notes, or assist in the preparation of the post-interview report. If this were all, I might be at least somewhat more inclined to agree with the majority that the district court's decision to credit Gray's testimony instead of Johnson's is effectively immune from review. There is, however, more.

The majority opinion omits the crucial fact that the district court, not the government, called Gray as a witness during Davenport's sentencing hearing. I do not question the propriety of the district court's having called Gray to testify. To be sure, trial courts in criminal cases often call and are authorized to call their own witnesses. Nor do I question the district court's having taken Gray's testimony into account. Instead, I question the amount of weight that the district court attached to that testimony.

In the jury-trial context, judges calling their own witnesses typically instruct the jury that, in weighing the evidence, the jury is not to give the testimony of the court's witnesses any more weight than that of the parties' witnesses. *See, e.g.*, *Apanovitch v. Houk*, 466 F.3d 460, 485 (6th Cir. 2006). Strong policy rationales support this practice, which the Fourth Circuit neatly summarized some time ago:

> A trial judge is not captive within the case as made by the parties. He has the authority, if not the duty, to call witnesses who possess relevant information affecting the outcome of the issues when the parties decline to call them. But the due process clause requires that a court be impartial. This impartiality is destroyed when the

court assumes the role of prosecutor and undertakes to produce evidence, essential to overcome the defendant's presumption of innocence, which the government has declined to present. Further, in this case the jury was never told why the witnesses were called as court witnesses and the jury was not instructed that these witnesses were entitled to no greater credibility because they had been called by the court. The jury, thus, may well have afforded them greater credibility than if they had been called as government witnesses. The jury's determination of credibility of witnesses may therefore have been unfairly, albeit unintentionally, influenced and the government's case thereby strengthened.

*United States v. Karnes*, 531 F.2d 214, 216-17 (4th Cir. 1976).

I acknowledge that sentencing presents a different context than trial. At sentencing, for one thing, the court is free to consider otherwise inadmissible evidence such as hearsay in determining the defendant's sentence. And a sentencing court obviously cannot instruct itself as to the amount of weight a particular piece of evidence deserves or does not deserve to be accorded. But the same policies that underlie such instructions should presumably apply.

In the present case, the district court not only called Agent Gray as its own witness, but rested its ultimate conclusion that Davenport was responsible for 1,365.1 grams of methamphetamine, as opposed to the 6.9 grams stipulated to by the government in Davenport's plea agreement, almost entirely on Gray's testimony. The court's own words are telling:

> Now, with respect to the pre-sentence reports, I will adopt the findings in the pre-sentence report for Mr. Davenport, as well as the additional findings that I have outlined, based on the testimony presented. *In particular, I do place a lot of emphasis on Special Agent Gray*.

(Emphasis added.)

This credibility determination is especially disturbing when viewed in the context of Agent Johnson's testimony, as recounted above. Agent Gray was not only the court's own witness, but also

- 24 -

the witness whose testimony most directly undermined Davenport's principal witness, Agent Johnson. Absent a convincing explanation from the district court, I cannot see how Gray possibly could have won that battle in the court's eyes.

The comparison should not have been between simply what Agent Gray said at sentencing as opposed to what Agent Johnson said at sentencing. Instead, the comparison should have pitted what Agent Gray said at sentencing against what Agent Johnson said at sentencing *as well as what Agent Johnson wrote immediately following the post-arrest interview of Davenport*. Johnson's testimony at sentencing was consistent with his DEA report, which he obviously wrote before he became a witness for Davenport and thus before he could have acquired any possible motive to misrepresent the facts in Davenport's favor. Gray himself even admitted that the statement he recalled Davenport making "[w]ould . . . be something that you guys in the DEA would try to include in your report." The district court nonetheless "placed a lot of emphasis on Special Agent Gray," who testified based solely on his memory of words that were spoken during an interview held more than a full year earlier.

### 3.       *Abner's testimony*

The majority opinion also relies on "the testimony of codefendant Abner that Davenport helped Wilson steal the meth" as one of the pieces of evidence that the district court "implicitly credited" in finding Davenport responsible for the full quantity of methamphetamine. (Maj. Op. at 6) But this alleged testimony, which does not appear in the record and for which the majority offers

no citation, misstates Abner's actual testimony. (I do not contest the separate matter of Abner's testimony regarding Davenport's possession of the gun.)

At the joint sentencing hearing, the district court asked Abner no fewer than four times whether "of the three defendants that are in this case, you and Mr. Wilson and Mr. Davenport, do you have personal knowledge of who was involved in the theft of the methamphetamine?" Abner repeatedly answered "no." Even when the district court, seemingly incredulous at Abner's answers, pressed Abner rather forcefully by asking "You just don't know?" she replied "No, I really don't."

The majority opinion summarily dismisses this testimony as insignificant, noting that "the record *allowed* the district court to discredit Abner's testimony that she had no personal knowledge of who stole the meth, but it did not *compel* the court to do so." (Maj. Op. at 12) For the purposes of the balancing required by the preponderance-of-the-evidence standard, however, Abner's testimony, which tips if at all in Davenport's favor, does matter. Of the first three pieces of evidence listed by the majority opinion, only Agent Gray's testimony supported the district court's decision to adopt the drug-quantity recommendation in the PSR instead of that in Davenport's plea agreement. That leaves the fourth piece of evidence—codefendant Wilson's testimony.

### 4.    *Wilson's testimony*

At the joint sentencing hearing, Wilson testified that "me and Gary [Davenport] went and stole it" and that "[j]ust me and Gary" were present at the time. Wilson also testified in an earlier change-of-plea hearing that he remained in the vehicle while Davenport stole the methamphetamine.

These are the only statements, aside from Agent Gray's testimony, that implicate Davenport in the actual theft. Putting aside the fact that Davenport was not charged with conspiracy per se, I readily acknowledge this court's general rule that "testimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (brackets omitted). The district court in the present case, however, at least implicitly doubted the credibility of Wilson's testimony by not mentioning it in the court's final analysis of the evidence presented. Instead, as noted, the court stated that "I do place a lot of emphasis on Special Agent Gray." The shakiness of Wilson's testimony is certainly understandable in light of the fact that he was trying to pin the primary blame for the theft on Davenport, contrary to the testimony of all of the other witnesses, including Agent Gray.

In sum, the district court's decision to attribute all 1,365.1 grams of the seized methamphetamine to Davenport relied almost exclusively on the testimony of a DEA agent (Gray), who was called as the court's own witness and who testified about unrecorded statements allegedly made to him over a year earlier. This is hardly a "preponderance of the evidence," especially when measured against the contrary evidence discussed in Part I.A. above. The simple fact that all of the actual methamphetamine seized appears to have derived from the same source does not, in my opinion, change this conclusion. Who actively participated in the theft of the methamphetamine—as opposed to who later possessed the methamphetamine once it had been stolen—is the issue we have to decide.

Finally, I reiterate what the majority opinion concedes: "It was *the prosecution's burden to prove* the amount of meth attributable to Davenport by a preponderance of the evidence." (Maj. Op. at 6 (citing *Swanberg*, 370 F.3d at 625)) (Emphasis added.) If the prosecution "proved" that all 1,365.1 grams of the stolen methamphetamine should have been attributed to Davenport, it did so only inadvertently. The majority opinion all but ignores the fact that the government objected in writing to the PSR's recommendation to attribute the full amount of the methamphetamine seized to Davenport. Instead, the government insisted that the district court hold Davenport accountable for only 6.9 grams, noting that "the United States does not believe that the drug amount over and above the Plea Agreement could be proven at trial." At the sentencing hearing, moreover, the prosecution called *no* witnesses. These facts, taken together with those set forth above, at least raise a suspicion that the district court was intent on establishing a preponderance of the evidence by its own doing. To dispel this suspicion, it should be required to clearly articulate why it weighed the evidence as it did.

## II. CONCLUSION

For all of the reasons set forth above, I would **VACATE** the judgment of the district court and **REMAND** the case for a fuller explanation of its reasons for attributing the entire quantity of seized methamphetamine to Davenport.